IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL FOWLER, PEPPI FOWLER, VICTOR CORTES, and DANNY NEVAREZ, as relators under the False Claims Act, ) ) ) ) ) ) Plaintiffs, ) ) v. ) ) CAREMARK RX, INC., a Delaware ) corporation, and CAREMARK INC., a ) Delaware corporation, ) ) Defendants. ) | Civil Action No.: 03 C 8714<br><br>Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

Michael Fowler, Peppi Fowler, Victor Cortes, and Danny Nevarez, on behalf of the United States, sued their former employer, Caremark Inc., and its parent, Caremark Rx, Inc. (collectively "Caremark"), for alleged fraudulent practices in distributing prescription drugs to members of various federal health insurance plans. Plaintiffs initially brought a four-count amended complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the false claims acts of the District of Columbia, Louisiana, Michigan, Tennessee, and Texas. Their amended complaint was dismissed for failure to plead fraud with particularity and to comply with state statutory requirements. *United States ex rel. Fowler v. Caremark, Rx, Inc.*, No. 03 8714, 2006 WL 1519567, at **3-5 (N.D. Ill. May 30, 2006) (Conlon, J.). They filed a second amended complaint asserting only FCA claims. Defendants now move to dismiss the second amended complaint pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), and 12(b)(6). For the reasons set forth below, the motion is granted.

# BACKGROUND

## I. The Second Amended Complaint

The following facts are derived from the second amended complaint. Caremark provides pharmacy benefit services to health insurance plans. Second Am. Compl. at ¶¶ 4, 7. Caremark maintains facilities at four locations: Miramar, Florida; Mount Prospect, Illinois; Phoenix, Arizona; and San Antonio, Texas. *Id.* at ¶ 8. At each facility, hundreds of Caremark employees process prescription orders for over 20 million plan members nationwide. *Id.* at ¶¶ 7-8. At all relevant times, Caremark employed the Fowlers at its Florida facility, and Cortes and Nevarez at its Texas facility. *Id.* at ¶¶ 1-3. Through their employment, plaintiffs gained personal knowledge of Caremark's procedures, policies, and practices. *Id.*

Caremark services several federal health insurance plans including: (1) the National Association of Letter Carriers Plan; (2) the National Rural Carriers Benefit Plan of the National Rural Letter Carriers Association; (3) the National Mail Handlers Union Plan; and (4) the Sierra Military Plan. *Id.* at ¶¶ 5, 9, 18. Caremark's government contracts have allegedly generated several billion dollars in revenue. *Id.* at ¶ 21. Under these contracts, Caremark processes orders from plan members and mails prescription drugs to them. *Id.* at ¶ 8. Caremark also provides "conversion" or "intervention" services in order to incur savings for the federal plans. *E.g., id.* at ¶¶ 34, 327. Savings refers to the cost differential between a plan member's original order and the actual order Caremark delivers. *Id.* at ¶¶ 327-28. For example, if Caremark obtains approval from plan members' doctors to convert a prescription drug to an over the counter drug, to reduce dosage, or to discontinue refills, the federal plans would then pay less for the orders. *Id.* at ¶ 34. In return, the federal plans would pay Caremark a fee for generating savings. *See, e.g., id.* at ¶¶ 42, 330. In

addition to providing intervention services, Caremark is subject to performance guarantees. *E.g.*, *id.* at ¶ 33. For example, Caremark is required to ship prescription drugs to plan members within a specified number of days after receiving their orders. *E.g.*, *id.* at ¶ 75 (95% of the prescription orders not requiring intervention must be shipped within two business days). Caremark must pay penalty for failing to meet turn-around time guarantees. *E.g.*, *id.* at ¶ 34.

Plaintiffs' claims arise from Caremark's government contracts. The second amended complaint alleges schemes through which Caremark concealed turn-around time lapses, charged excessive intervention fees, and improperly restocked and resold returned drugs.

### A. Turn-Around Time

Plaintiffs allege Caremark schemed to conceal its failure to meet turn-around time guarantees. *See id.* at ¶¶ 238-325. The alleged schemes are three-fold. First, as a routine practice, Caremark employees allegedly falsified receipt dates for prescription orders. *Id.* at ¶ 255. Second, Caremark allegedly implemented procedures to artificially restart the turn-around time clock. *See id.* at ¶¶ 261-62. For example, if an order remained unfilled beyond the required turn-around time period, a Caremark employee would contact the plan member to obtain confirmation to process the order. *Id.* Caremark would then treat the order as newly received for turn-around time purposes. *Id.* Finally, Caremark allegedly transferred orders between facilities to conceal processing delays. *Id.* at ¶¶ 252-55. For example, when one facility was inundated with orders, it would divert unfilled orders to other facilities. *Id.* at ¶ 252. Employees at the facility receiving the diverted orders would treat the diverted orders as if they were received directly from plan members. *Id.* at ¶ 253.

Plaintiffs claim they have personal knowledge of Caremark's schemes. For example, they allege Nevarez "change[d] the received dates on thousands of . . . orders." *Id.* at ¶ 273. They also

3

submit samples of Caremark's annual guarantee analysis. *E.g.*, *id.* at ¶¶ 299-302, Ex. 25. They allege that in these analyses, Caremark falsely verified that it met turn-around time guarantees and, accordingly, owed no monetary penalty. *Id.* at ¶ 301. But plaintiffs do not identify a single order with falsified turn-around time. Nor do they tie any orders to Caremark's analyses.

## B. Intervention

Plaintiffs allege Caremark schemed to charge excessive intervention fees. *Id.* at ¶ 350. The alleged schemes primarily involve fraudulently procured authorizations for conversion. *Id.* at ¶ 335. For example, Caremark allegedly encouraged its employees to seek authorization from receptionists and nurses in doctors' offices, rather than from the prescribing doctors themselves. *Id.* at ¶¶ 335-40. As a result, Caremark employees regularly altered federal plan members' prescriptions based on improper authorizations. *Id.* at ¶¶ 354-55.

Plaintiffs identify Caremark employees who knew about the alleged schemes, as well as their work locations. *E.g.*, *id.* at ¶¶ 352-58. Plaintiffs also submit volumes of savings reports listing prescription orders and their respective savings. *Id.* Exs. 30-31. But nowhere in these reports or in the second amended complaint do plaintiffs identify an instance of improper authorization.

## C. Returned Drugs

Plaintiffs allege that as a standard practice, Caremark restocked all returned drugs after only a cursory inspection, and resold them without regard to plan members' safety. *Id.* at ¶¶ 130, 137-38. Caremark allegedly failed to credit the federal plans for drugs returned by plan members. *Id.* at ¶ 139. This practice allegedly violated the government contracts, as well as various state laws. *Id.* at ¶¶ 139, 148-53.

4

Plaintiffs identify Caremark employees who allegedly restocked returned drugs, as well as their work location. *E.g., id.* at ¶¶ 147, 171, 188, 203. But plaintiffs do not allege a single instance when returned drugs were improperly restocked. Plaintiffs submit exhibits purporting to identify invoices in which Caremark requested payment for over 20,000 orders filled with returned drugs. *Id.* Exs. 21-24, 32-34; *see also* Pls. Mem. at 10. But these exhibits do not indicate Caremark failed to give credit for returned drugs, or that returned drugs were damaged.

## II.  Discovery

In the second amended complaint, 514 paragraphs sprawl over 178 pages; over a thousand pages are attached as exhibits. The volume of plaintiffs' pleadings shows extensive discovery has been conducted in this three year old case. On April 24, 2006, Caremark produced nearly 6,000 pages of documents. Leonard Aff., Pls. Mem. Ex. 1 at ¶ 21. Plaintiffs derived the majority of their complaint exhibits from Caremark's discovery materials. *Id.* at ¶¶ 21-23.

On May 9, 2006, 15 days after receiving Caremark's discovery materials, plaintiffs also received over 100,000 pages of Caremark documents from the United States Attorney's Office. *Id.* at ¶ 24. These documents originated from Caremark's disclosure to the government in 2004, when this case was under seal. Kocoras Aff., Defs. Mem. Ex. 1 at ¶¶ 3, 10. Most of the United States Attorney's documents duplicated Caremark's April 24, 2006 production to plaintiffs. From these documents, plaintiffs derived Exhibits 16, 17, 18, 30, 31, and 35 to the second amended complaint. *See* Defs. Mem. Ex. B. Plaintiffs' exhibits consisted of three contracts and invoices, as well as two savings reports related to plaintiffs' intervention claims. *See* Second Am. Compl. Exs. 16-18, 30-31, 35.

## DISCUSSION

### I. Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint, and dismissal is warranted only if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (quoting *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)). On a motion to dismiss, all well-pleaded allegations are accepted as true and all reasonable inferences are drawn in favor of the non-moving party. *Cler*, 423 F.3d at 729. Generally, to survive a motion to dismiss, a complaint need only provide a short and plain statement giving defendants fair notice of the nature and basis of the claim. Fed. R. Civ. P. 8(a); *DeWalt*, 224 F.3d at 612. But a fraud claim must allege facts with particularity. Fed. R. Civ. P. 9(b). Under this rule, a fraud claim must identify: (1) the person(s) who made the alleged misrepresentation; (2) the time, place, and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated to plaintiffs. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). In other words, this rule requires the "who, what, when, where, and how" of the circumstances of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

A motion to dismiss under Rule 12(b)(1) challenges the court's jurisdiction. Fed. R. Civ. P. 12(b)(1). On a Rule 12(b)(1) motion, the court may consider evidence outside the pleadings. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003). And plaintiffs bear the burden to establish jurisdiction. *Id.*

## II. Jurisdictional Bar

Defendants argue that 31 U.S.C. § 3730(e) deprives the court of subject matter jurisdiction over this case. This provision bars courts from hearing any *qui tam* cases "based upon the public disclosure of allegations or transactions in . . . [an] investigation . . . unless . . . [plaintiff] is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The provision was enacted "in the context of the 1986 amendments, which . . . broaden the *qui tam* provisions, increasing the incentives for the exposure of fraud." *United States ex rel Mathews v. Bank of Farmington*, 166 F.3d 853, 858 (7th Cir. 1999). The provision aims to encourage whistleblowers to inform the government of fraud on the one hand, and to prevent parasitic *qui tam* suits on the other. *Id.* at 859. Imposition of the jurisdictional bar under 31 U.S.C. § 3730(e) must be consistent with this legislative purpose. *Id.*

To clear the jurisdictional bar, plaintiffs must establish one of the following three conditions: (1) the allegations in their second amended complaint have not been publicly disclosed; (2) if the allegations were in fact publicly disclosed, then plaintiffs are the original source of the information; or (3) plaintiffs' claims are not based upon public disclosure. *Mathews*, 166 F.3d at 859. Plaintiffs concede that they fail the first two prongs of the *Mathews* test. They do not dispute Caremark's 2004 disclosure to the United States Attorney constitutes "public disclosure" within the meaning of 31 U.S.C. § 3730(e)(4)(A). *See id.* at 861 (defining "public disclosure" as "[d]isclosure of information to a competent public official about an alleged false claim"). Nor do they claim to be an "original source" under 31 U.S.C. § 3730(e)(4)(A), absent evidence that before filing this case, they had volunteered information to the government. 31 U.S.C. § 3730(e)(4)(B). Accordingly, to defeat defendants' jurisdictional challenge, plaintiffs must establish the third prong of the *Mathews* test: their claims are not based upon public disclosure. *Mathews*, 166 F.3d at 859.

7

Under *Mathews*, a claim is "based upon" public disclosure if it "both depends essentially upon publicly disclosed information *and is actually derived from such information*." *Id.* at 864 (emphasis supplied). *Mathews* does not impose the jurisdictional bar on *qui tam* plaintiffs whose claims are based on information from a non-public source, even though their information is identical to publicly disclosed information. *Id.* at 863 (endorsing the minority view held by the Fourth Circuit). Accordingly, plaintiffs may avoid the jurisdictional bar if their claims are based on information from a source independent of Caremark's public disclosure.

Plaintiffs argue their claims are based on their own investigation and Caremark's discovery materials, and not on Caremark's 2004 disclosure to the United States Attorney. Leonard Aff. at ¶¶ 21-25. Their argument finds support in the record. First, plaintiffs received Caremark's discovery materials 15 days prior to obtaining Caremark's 2004 government disclosure. *Id.* at ¶ 24. Caremark's discovery materials were not filed with the court and therefore fell outside "public disclosure" under 31 U.S.C. § 3730(e)(4)(A). *Mathews*, 166 F.3d at 860. Second, plaintiffs derived the majority of their complaint exhibits from Caremark's discovery materials. *See* Defs. Mem. Ex. B. For example, of the fifteen exhibits purporting to show Caremark's fraudulent billing practices, twelve came from Caremark's discovery materials. *See id.* More importantly, plaintiffs created the four key exhibits purporting to identify Caremark's false claims submitted to the government. S*ee* Second Am. Compl. Exs. 24, 32-34. While several additional exhibits were drawn from Caremark's disclosure to the United States Attorney, they were insignificant because they duplicated exhibits obtained in discovery in this case in both form and substance. *See* Defs. Mem. Ex. B; *see also* Second Am. Compl. Exs. 16-18, 30-31, 35 (three contracts, three invoices, and two savings reports).

Based on this record, it cannot be said that plaintiffs' claims are based upon Caremark's public disclosure to the United States Attorney.

This case is distinguishable from *Mathews*. Although Mathews was first alerted to the underlying fraud from a non-public source, she relied on public disclosure to confirm the existence of the fraud. *Mathews*, 166 F.3d at 863. In addition, she cited the public disclosure in her *qui tam* complaint. *Id.* Accordingly, her claims were "actually and substantially derived from [public] disclosure." *Id.* In contrast, plaintiffs here had personal knowledge of the alleged fraud and conducted their own investigation. Leonard Aff. at ¶¶ 4-6. They also obtained the majority of their complaint exhibits from discovery, independent of Caremark's disclosure to the United States Attorney. *Id.* at ¶¶ 21-25. *Mathews* therefore lends no support to Caremark's position.

In addition to *Mathews*, Caremark relies on three distinguishable cases: *United States ex rel. Bannon v. Edgewater Medical Center*, 406 F. Supp. 2d 907 (N.D. Ill. 2005) (Cole, M.J.); *United States ex rel. Gross v. Aids Research Alliance-Chicago*, No. 01 C 8182, 2004 WL 905952 (N.D. Ill. Apr. 27, 2004) (Hibbler, J.), *aff'd*, 415 F.3d 601 (7th Cir. 2005); and *United States ex rel. Feingold v. Associated Insurance Co.*, No. 98 C 4392, 2001 WL 1155250 (N.D. Ill. Sept. 28, 2001) (Guzman, J.), *aff'd sub nom. United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492 (7th Cir. 2003). Relators in all three cases proffered no evidence demonstrating their claims derived from non-pubic information. *Bannon*, 406 F. Supp 2d. at 922 (while relator asserts "she discovered the fraud independently of [the public disclosure], there is no explanation of how that occurred"); *Gross*, 2004 WL 905952, at *7 (same); *Feingold*, 2001 WL 1155250, at *9 (same). In addition, the timing of their *qui tam* complaints indicates relators were typical parasitic plaintiffs. *See Bannon*, 406 F. Supp. 2d at 910 (filing suit four years after public disclosure); *Gross*, 2004 WL 905952, at **3-4

(amending the complaint solely based on information from the public disclosure); *Feingold*, 2001 WL 1155250, at *1 (filing suit after collecting publicly available information). In contrast, plaintiffs filed this case nearly three years before Caremark's disclosure to the United States Attorney was made available to them. Leonard Aff. at ¶¶ 2, 16. Plaintiffs also aided the government during its investigation while the case was under seal. *Id.* at ¶¶ 3-12. More importantly, they had information sources independent of public disclosure. *Id.* at ¶¶ 4, 21-25. Unlike the relators in *Bannon*, *Gross*, and *Feingold*, plaintiffs are the type of whistle-blowers 31 U.S.C. § 3730 aims to encourage. *See Mathews*, 166 F.3d at 858 ("Congress intended that the courts not be troubled by persons who wish to capitalize on others' discovery of frauds"). Accordingly, Caremark's reliance on these cases is misplaced.

Caremark also argues the second amended complaint improperly relies on materials plaintiffs hope to obtain in discovery. This argument has no bearing on jurisdiction and must therefore be rejected. *See Mathews*, 166 F.3d at 858 (sufficiency of pleadings falls outside the three-prong test). Because the record shows plaintiffs' claims are not based upon public disclosure, the second amended complaint clears the jurisdictional hurdle under 31 U.S.C. § 3730(e)(4)(A).

### III. Sufficiency of the Second Amended Complaint

In the May 30, 2006 memorandum opinion and order dismissing the first amended complaint, the court held plaintiffs must "set forth facts identifying the 'who, what, when where, and how'" of Caremark's alleged fraud, in order to satisfy Fed. R. Civ. P. 9(b). *Fowler*, 2006 WL 1519567, at *3 (citing cases). The court further alerted plaintiffs to relevant case law setting forth Rule 9(b)'s requirements in detail. *Id.* For example, the court cited *Peterson v. Community General Hospital*, No. 01 C 50356, 2003 WL 262515 (N.D. Ill. Feb. 7, 2003) (Reinhard, J.). In *Peterson*, relator sued

several hospitals for alleged false Medicare claims. *Id.* at *1. He alleged defendants fraudulently obtained referrals of Medicare patients, and billed the government for Medicare services. *Id.* But his complaint was dismissed because he failed to specify a single Medicare patient treated by defendants:

> But which patients? And which claims? And which claims or other documents show defendants falsely certified their compliance with federal law? These questions are absolutely essential to relator's claim of fraud. Their answers, however, cannot be found anywhere in the sort of all-inclusive allegations [in relator's complaint]. They must be pleaded with particularity.

*Id.* Although plaintiffs were alerted to *Peterson*, their second amended complaint still misses the mark.

Compared to the previously dismissed complaint, the second amended complaint elaborates in detail plaintiffs' personal knowledge of the alleged schemes, adds lists of Caremark employees involved in the alleged schemes, and identifies invoices allegedly containing false claims. *See, e.g.*, Second Amended Compl. at ¶¶ 147, 272, Exs. 24, 32. But like the complaint in *Peterson*, these added allegations do not identify a single prescription through which Caremark perpetrated the alleged fraud. Nor do they tie a specific fraudulent transaction to an invoice submitted to the government. Accordingly, these allegations cannot satisfy Rule 9(b)'s requirement to give Caremark notice of the alleged fraud. *Peterson*, 2003 WL 262515, at *2; *see also United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (generalized allegations do not satisfy Rule 9(b)).

Plaintiffs point to some invoices purporting to identify prescriptions that were filled with returned drugs. *See, e.g.*, Second Am. Compl. Ex. 32. But the practice of filling orders with returned drugs, in itself, is not fraud; viewed in the light most favorable to plaintiffs, the practice

becomes fraud only if Caremark fails to credit the federal plans for the returned drugs, or to properly inspect the returned drugs. Nowhere in these invoices or in the second amended complaint itself do plaintiffs allege Caremark committed fraud in processing the enumerated prescription orders. *See United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("[t]o satisfy Rule 9(b), [plaintiff must] allege that [defendant] said something knowing at the time that the representation was false"). Absent allegations of specific fraudulent conduct, the second amended complaint must be dismissed. *Peterson*, 2003 WL 262515, at *2.

Arguing the contrary, plaintiffs urge the court to follow *United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430 (E.D. Pa. 2004) (Newcomer, J.), in which a complaint survived a Rule 9(b) challenge. Plaintiffs argue the *Hunt* complaint is similar to their second amended complaint. But their argument is unpersuasive because, unlike their second amended complaint, the *Hunt* complaint identified specific misrepresentations. *See, e.g.*, Pls. Mem. Ex. 2. at ¶¶ 54-58, 172-73. Moreover, the *Hunt* court concluded, without citing any case law, that defendants had sufficient notice of the claims. *Hunt*, 336 F. Supp. 2d at 437. In contrast, notice is woefully inadequate where, as here, plaintiffs allege only generalized schemes and fail to specify a single false claim. *See, e.g.*, Second Am. Compl. at ¶ 481 (alleging "[e]ach and every" Caremark invoice constituted a false claim). In any event, because *Hunt* is neither precedential nor persuasive, plaintiffs' reliance on *Hunt* is unconvincing.

The second amended complaint cannot pass muster under Rule 9(b) and must therefore be dismissed. Accordingly, the court need not reach Caremark's alternative arguments based on Rule 12(b)(6).

## IV. Leave to Amend

When the first amended complaint was dismissed for failure to comply with Rule 9(b), plaintiffs were given an opportunity to cure pleading defects. In response, they submitted a 178-page complaint and over a thousand pages of exhibits. Laden with baffling acronyms, their sprawling pleadings raised questions whether they complied with Rule 8(a)'s requirement of a "short and plain" statement.[1] *Garst*, 328 F.3d at 378 (dismissing a disorganized 74-page *qui tam* complaint for failure to comply with Rule 8(a)). And despite receiving clear instructions, they failed again to plead fraud with particularity.

Plaintiffs' repeated failure to comply with Rule 9(b) instills little confidence that a blank check to amend the complaint again would serve any purpose other than drawing another motion to dismiss on the same grounds. *See Guise v. BWM Mortgage, LLC*, 377 F.3d 795, 801 (7th Cir. 2004) ("a district court may deny leave to amend on the grounds of undue delay, bad faith, dilatory motive, prejudice, or futility"); *see also Robbins v. Desnick*, No. 90 C 2371, 1991 WL 5829, at *4 (N.D. Ill. Jan. 15, 1991) (Conlon, J.) (dismissing a *qui tam* complaint with prejudice for failure to state a claim). But because the claims here are not facially frivolous, this case is not dismissed with prejudice. To prevail on a motion for leave to file a third amended complaint, plaintiffs must submit a proposed third amended complaint that complies with Rules 8(a) and 9(b).

---

[1] The first 100 paragraphs of the second amended complaint contain acronyms such as "SOP," "OPM," "NALC," "NRLCA," "CCM," and "CCR."

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the second amended complaint is granted. This case is dismissed without prejudice.

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

August 21, 2006