IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL FOWLER, PEPPI FOWLER, VICTOR CORTES, and DANNY NEVAREZ, as relators under the FALSE CLAIMS ACT, Plaintiffs, v. CAREMARK RX, INC., a Delaware corporation, and CAREMARK, INC., a Delaware corporation, Defendants. | Civil Action No.: 03 C 8714 Suzanne B. Conlon, Judge |

## MEMORANDUM OPINION AND ORDER

Michael Fowler, Peppi Fowler, Victor Cortes, and Danny Nevarez brought a *qui tam* action against their former employer, Caremark, Inc., and its parent, Caremark Rx, Inc. (collectively "Caremark"), alleging fraud involving the distribution of prescription drugs to federal health insurance plan members. Plaintiffs initially filed a four-count amended complaint under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and state false claims statutes. The amended complaint was dismissed for failure to plead fraud with particularity and to comply with state *qui tam* procedures. *United States ex rel. Fowler v. Caremark Rx, Inc.*, No. 03 C 8714, 2006 WL 1519567, at *6 (N.D. Ill. May 30, 2006) ("*Fowler I*"). Plaintiffs filed a second amended complaint, dropping the state claims. Again, the court dismissed the complaint for failure to adequately plead fraud. *United States ex rel. Fowler v. Caremark Rx, Inc.*, No. Civ.A. 03C8714, 2006 WL 2425331, at *7 (N.D. Ill. Aug. 21, 2006) ("*Fowler II*"). The court required plaintiffs to seek leave before filing a third amended

complaint. Plaintiffs now move to do so under Fed. R. Civ. P. 15(a). Caremark objects. For the reasons set forth below, plaintiffs' motion is denied and the case is dismissed.

## BACKGROUND

Plaintiffs filed this lawsuit in December 2003. Pursuant to 31 U.S.C. § 3730, the complaint remained under seal while the United States Attorney's Office conducted an investigation to determine whether it would intervene. The government declined intervention in January 2006. The court vacated the sealing order shortly thereafter.

While the case was under seal, plaintiffs filed an amended complaint. The amended complaint alleged that Caremark, a pharmaceutical services company with revenues of $8 billion, submitted millions of dollars in false claims to the federal government in violation of federal and state false claims statutes. *See Fowler I*, 2006 WL 1519567, at *1. The alleged false claims arose from five government contracts obligating Caremark to provide prescription drugs to members of federal health insurance plans. *Id.* According to plaintiffs, the fraud was extensive. First, Caremark falsified the dates when prescription drug orders were received from thousands of plan members. *Id.* Caremark did this because it was inundated with orders and unable to meet contractual fulfillment deadlines. *Id.* By falsifying the date orders were received, Caremark gave itself more processing and delivery time and avoided non-performance penalties. *Id.* Second, Caremark routinely double-billed the government for prescription drugs returned by plan members. *Id.* When drugs were returned, Caremark restocked and resold them but failed to credit the government for the returns. *Id.* Third, Caremark committed various other frauds, including falsifying prescription dates, fraudulently altering existing prescriptions, delaying and cancelling drug orders without notice, manipulating internal records, and refusing to make less-expensive generic drugs available to plan

2

members. *Id.* at *2. According to plaintiffs, these acts were not isolated; Caremark implemented national policies and procedures to systematically defraud the government. *Id.* at *1.

Although the amended complaint consisted of 250 paragraphs and 49 pages, it was short on substance. Caremark moved to dismiss the complaint for failure to plead fraud with particularity. The court agreed, holding that Caremark failed to "set forth facts identifying the 'who, what, when, where and how' requirements for pleading fraud." *Fowler I*, 2006 WL 1519567, at *3 (quoting *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Plaintiffs' "brief sketch" of the alleged fraud did not meet Rule 9(b)'s heightened pleading standards. *Id.* The court granted Caremark's motion and dismissed the amended complaint without prejudice. *Id.* at *6.

Plaintiffs filed a second amended complaint in June 2006. The complaint made its predecessor look anemic by comparison. It consisted of 514 paragraphs covering 178 pages, with over a thousand pages of exhibits. *Fowler II*, 2006 WL 2425331, at *3. Plaintiffs dropped the state law claims, focusing instead on three alleged schemes violating the False Claims Act. First, Caremark fraudulently concealed its failure to meet turn-around times for filling drug orders. *Id.* at *2. Caremark accomplished this three ways: falsifying receipt dates of prescription orders, shipping aging orders to other Caremark facilities to be processed as newly-received, and seeking unnecessary confirmations from plan members to process orders as a way to restart the fulfillment clock. *Id.* Second, Caremark overcharged the government for "intervention services" designed to reduce waste in the insurance plans. *Id.* Caremark obtained authorization to change patients' prescriptions from persons other than the prescribing doctors, and then used these unauthorized "switches" to generate savings for the insurance plans and performance bonuses. *Id.* Third, Caremark restocked all

3

returned drugs after only a cursory inspection and resold them without regard to plan members' safety. *Id.* at *3. The government was never credited for the returns; instead, Caremark charged the government again when it resold the returned drugs. *Id.* In support of their claims, plaintiffs attached annual guarantee analyses, savings reports, and invoices identifying over 20,000 prescription orders allegedly filled with returned drugs. *Id.* at *2-3.

Once again, Caremark moved to dismiss based on Rule 9(b), and the second amended complaint was dismissed. The court found the latest complaint elaborated on plaintiffs' personal knowledge of the alleged schemes, added lists of culpable Caremark employees, and identified invoices containing purported false claims. *Fowler II*, 2006 WL 2425331, at *6. However, the complaint "d[id] not identify a single prescription through which Caremark perpetrated the alleged fraud. Nor d[id] [it] tie a specific fraudulent transaction to an invoice submitted to the government." *Id.* The deficiencies pervaded the complaint. *Id.* at *2-3 (plaintiffs had not identified "a single order with [a] falsified turn-around time;" none of the savings reports identified "an instance of improper authorization;" and plaintiffs did not allege "a single instance when drugs were improperly restocked"). Accordingly, plaintiffs had not "satisf[ied] Rule 9(b)'s requirement to give Caremark notice of the alleged fraud." *Id.* at *6.

The court also expressed dissatisfaction with the complaint's prolixity:

> When the first amended complaint was dismissed for failure to comply with Rule 9(b), plaintiffs were given an opportunity to cure pleading defects. In response, they submitted a 178-page complaint and over a thousand pages of exhibits. Laden with baffling acronyms, their sprawling pleadings raised questions whether they complied with Rule 8(a)'s requirement of a "short and plain" statement. And despite receiving clear instructions, they failed again to plead fraud with particularity. Plaintiffs' repeated failure to comply with Rule 9(b) instills little confidence that a blank check to amend the

4

> complaint would serve any purpose other than drawing another
> motion to dismiss on the same grounds.

*Id.* at *7 (internal citations and footnote omitted). Despite the admonition, the court determined plaintiffs' allegations were not factually frivolous. *Id.* Therefore, the second amended complaint was dismissed without prejudice, and plaintiffs were required to file a motion for leave to file a third amended complaint. *Id.* The court warned that the motion for leave would be granted only if the proposed complaint complied with Rules 8(a) and 9(b). *Id.* On November 16, 2006, plaintiffs filed their motion for leave to amend, attaching a "streamlined" third amended complaint.

## DISCUSSION

### I. Legal Standards

#### A. Motion for Leave to Amend

Leave to amend a complaint "shall be freely given when justice so requires." FED. R. CIV. P. 15(a). However, "a district court may deny leave to amend on the grounds of undue delay, bad faith, dilatory motive, prejudice, or futility." *Guise v. BMW Mortgage, LLC*, 377 F.3d 795, 801 (7th Cir. 2004). Amending a complaint is futile if the proposed complaint fails to state a claim upon which relief could be granted. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997) ("[t]his standard is the same standard of legal sufficiency that applies under Rule 12(b)(6)"). A court need not grant leave to amend where a plaintiff has repeatedly failed to cure the same deficiencies. *Id.* This is especially true when a court provides "detailed analyses of the deficiencies of the prior complaints and explicit guidance for curing those deficiencies." *Airborne Beepers & Video, Inc. v. Southwestern Bell Mobile Sys., LLC*, No. 02 C 9134, 2006 WL 951877, at *2 (N.D. Ill. Apr. 11, 2006) (Grady, J.).

5

## B. False Claims Act and Rule 9(b)

Leave to file a third amended complaint turns on whether the proposed complaint states a claim under the False Claims Act. The pertinent provisions of the act impose liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid by the Government; [or] (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1), (2), and (7). The False Claim Act is an anti-fraud statute; therefore, it is subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). *Gross*, 415 F.3d at 604. Under Rule 9(b), fraud must be alleged with particularity. Fraud claims must identify: (1) the person who made the alleged misrepresentation; (2) the time, place, and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated. *General Elec. Capital*, 128 F.3d at 1078 (plaintiffs must plead the "who, what, when, where, and how" of the alleged fraud). In the context of the False Claims Act, plaintiffs must link specific allegations of deceit to claims for government payment. *Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003).

## II. Insufficiency of the Third Amended Complaint

Plaintiffs proposed complaint alleges Caremark violated the False Claims Act by committing the following schemes: (a) improperly reselling returned drugs; (b) making unauthorized changes to prescriptions; (c) fraudulently altering turn-around times; (d) fraudulently reporting "CCR" savings; (e) refusing to provide generic drugs; and (f) misrepresenting prescriptions as "lost-in-transit." Caremark asserts the complaint fails to plead fraud with particularity because there are

6

insufficient links between the alleged schemes and the claims submitted to the government. Caremark requests plaintiffs' motion for leave to amend be denied and the case be dismissed with prejudice.

Before turning to whether the alleged schemes are pled with particularity, the court is compelled to address plaintiffs' contention that it "streamlined" the third amended complaint. Mot. at ¶ 3. The present version contains 234 paragraphs covering 119 pages. It references 174 exhibits, comparable in mass to the 1000-plus pages of exhibits attached to the second amended complaint. While there are 59 fewer pages and 280 fewer paragraphs (demonstrating the bloatedness of the second amended complaint), plaintiffs add entirely new fraud schemes and recharacterize others. Many paragraphs contain run-on sentences with so many clauses they are confusing. *See e.g.*, Mot. at Ex. 1, ¶¶ 35, 150, 173. The third amended complaint is not a "streamlined version" of its predecessor. Plaintiffs continue to ignore Rule 8(a)'s requirement that pleadings be "short and plain." FED. R. CIV. P. 8(a); *Garst*, 328 F.3d at 378 (upholding dismissal of 155-page complaint with 99 exhibits because "judges and adverse parties need not try to fish a gold coin from a bucket of mud"). However, the court need not address Rule 8(a) in light of the discussion below.

### A.  Improperly Reselling Returned Drugs

The first scheme alleged in the third amended complaint is that Caremark restocked and resold returned prescription drugs.[1] Prescriptions were returned to Caremark for a variety of reasons. 3rd Am. Compl. at ¶ 23. Pursuant to Caremark's "national practices and procedures," the returns were restocked and resold to plan members. *Id.* at ¶ 24. Plaintiffs contend this violated Caremark's

---

[1] Plaintiffs' factual allegations are taken as true; all reasonable inferences are drawn in their favor. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000).

7

contracts with the government and was illegal under state law. *Id.* at ¶¶ 24, 33, 213. According to plaintiffs, Caremark submitted false claims by billing the government for prescriptions it knew were returned. *Id.* at ¶¶ 28, 57, 213. Caremark committed a further fraud by failing to credit the government for the returns. *Id.* at ¶¶ 29, 57, 213. Plaintiffs offer ten examples to support its allegations. *Id.* at ¶¶ 44-54. The examples follow the same pattern: a "Return Goods Memo" shows the dates a specific prescription was sent to a plan member, returned to Caremark, and restocked; excerpts of claim data show a federal insurance plan is billed for the restocked drug shortly after the return; and that bill is included in a larger invoice sent to the government for payment. *See e.g., id.* at ¶ 44, Exs. 20-22. Based on these examples, plaintiffs contend Caremark made false claims for "every known returned drug." *Id.* at ¶ 43, Exs. 18, 19 (identifying over 20,000 prescriptions).

The Seventh Circuit recently addressed the sufficiency of an alleged restock/resale scheme under the False Claims Act. In *United States ex rel. Crews v. NCS Healthcare*, the plaintiff alleged prescription drugs were returned to the defendant's pharmacy, dumped in large bins, and then reused to fill future prescriptions. 460 F.3d 853, 855 (7th Cir. 2006). According to the plaintiff, the defendant submitted false claims by double-billing the government for the recycled medications and failing to credit the government for the returns. *Id.* The complaint was deficient under Rule 9(b) because the plaintiff had not identified the alleged double-billed claims submitted for the drugs' initial purchase *and* resale:

> Crews needs to point to at least two vouchers to meet her burden: one voucher in which the [government] is billed for certain pills, and then a second voucher in which the [government] is billed again for at least one of the same pills. Without more, the [v]oucher standing alone proves nothing.

*Id.* at 857; *see also Quinn v. Omnicare, Inc.*, 382 F.3d 432, 440 (3d Cir. 2004). The burden was on the plaintiff to "show the link between two vouchers that represent two separate charges for the same pill." *Id.* The failure-to-credit allegations suffered the same fate because "Crews fail[ed] to point to a specific voucher, one which billed for drugs that were later returned, with no credit given." *Id.* at 857-58. The fraud failed for the additional reason that the plaintiff had not identified a federal regulation prohibiting the sale of returned drugs. *Id.* at 858. *Crews* makes clear that to allege a False Claims Act violation, a plaintiff must link specific allegations of deceit to claims for government payment. *Id.* at 857-58; *see also Gross*, 415 F.3d at 605; *Garst*, 328 F.3d at 378.

Plaintiffs' restock/resale allegations must be viewed in the context of *Crews*. Plaintiffs allege two distinct frauds as part of the scheme, *i.e.*, billing for returned drugs and failing to credit for returns. Both frauds are supported by examples that detail only the return and resale of prescriptions. *See e.g.*, 3rd Am. Compl. at Exs. 24-26 (the "Return Goods Memos," claim data, and invoices all relate to the resale of returned prescriptions). There are no specific allegations and no examples of claims regarding the initial purchase of the drugs. Plaintiffs are required to specifically allege a claim relating to the initial purchase, a second claim relating to the resale, and allegations of deceit linking the two. *See Crews*, 460 F.3d at 857.

This requirement applies to both alleged frauds. Submitting a claim to the government for the resale of returned prescription drugs is not fraud unless a claim was *already* submitted for the same drugs. *Id.* Submitting a claim that omits credits for returns is not fraud unless the government *already* paid for the returns. *Id.* at 858. In other words, the claims alleged to be false in both frauds are only false based on prior claims submitted to the government. Plaintiffs' allegations attempt to characterize the frauds so only one claim is required to allege a violation. 3rd Am. Compl. at ¶¶ 28,

9

33, 213 (alleging single claim is false because Caremark knew drugs returned when made; alleging omitting credits in filed claim makes single claim false). But the substance of the allegations make clear that the frauds depend on an initial *and* subsequent claim. Therefore, plaintiffs must specifically allege "two separate charges for the same [drugs]" and "the link between [the] two." *Crews*, 460 F.3d at 857. While plaintiffs' examples are more detailed than the summary exhibits attached to the previous complaint, they still fall short of providing the necessary allegations under Rule 9(b). *Id.*; *see also Garst*, 328 F.3d at 378 (although relator had "come closer to specific allegations of deceit," the complaint was dismissed because he "fail[ed] to link them to any claim for payment").

Plaintiffs' allegations are deficient for the additional reason that they do not specifically identify which regulation or contractual provision Caremark violated. There is an initial question whether plaintiffs could ever allege a violation because the contracts are silent on whether Caremark is allowed to bill for returned drugs, 3rd Am. Compl. at Exs. 1, 2, 4-7, 9, 11, 13, and there is no regulatory requirement to reverse a claim once a drug is returned. *See Crews*, 460 F.3d at 858 (agreeing with analysis in *Quinn* that holds "there is no regulatory requirement of the reversal of a claim once a medication has been returned"); *Quinn*, 382 F.3d at 438. Even assuming the existence of an obligation by Caremark, plaintiffs have not particularly alleged the basis of the obligation. The complaint generally alleges it is illegal under state law to bill for restocked prescriptions, 3rd Am. Compl. at ¶¶ 24, 26, and failing to credit returns violated the contracts, *id.* at ¶ 213. But Rule 9(b) is not satisfied by generalized allegations. *See Gross*, 415 F.3d at 605 (general reference to the "regulatory framework" was insufficient "to clarify the causal connection between false certifications and government payouts"); *United States ex rel. Raymer v. Univ. of Chicago Hosps.*, No. 03 C 806,

2006 WL 516577, at *8 (N.D. Ill. Feb. 28, 2006) (Deryeghiayan, J.) ("without knowing *which* regulations are at issue, we cannot determine whether [the] alleged violations of unidentified regulations . . . affected NICU infants amounted to fraudulent misrepresentations"). Without particularized allegations, plaintiffs cannot properly plead a fraudulent restock/resale scheme.

### B. Prescription Drug Changes

Plaintiffs next allege Caremark submitted false claims by misrepresenting that it obtained proper authorization to change plan members' prescriptions. The alleged scheme centers around Caremark's "intervention" programs, which had the purpose of generating savings for the government by reducing inefficiencies in the insurance plans. 3rd Am. Compl. at ¶¶ 61, 65. The programs are supposed to operate as follows: Caremark analyzes a plan member's prescriptions and identifies possible savings; the prescriber is contacted and gives approval to change the prescriptions; the government saves money over the life of the prescriptions; and Caremark is paid for generating savings. *Id.* at ¶¶ 61-68. According to plaintiffs, Caremark made drug changes without prescriber approval, relying instead on authorization from nurses and receptionists. *Id.* at ¶ 73. Plaintiffs contend Caremark "billed and collected millions of dollars" from the government by claiming it properly obtained savings. *Id.* at ¶ 74. Plaintiffs provide approximately 20 examples they contend establish a "pattern and practice" of fraud. *Id.* at ¶¶ 80-148, 150. The examples include quarterly savings reports that allegedly incorporate unauthorized prescription changes. *See e.g., id.* at ¶¶ 88-90, Ex. 67. Plaintiffs also provide facsimile correspondence allegedly showing that Caremark made changes even though prescribers objected. *See e.g., id.* at ¶ 119, Ex. 95.

Neither plaintiffs' allegations nor the attached examples meet the pleading requirements of Rule 9(b). The majority of allegations contain boilerplate descriptions of how prescription changes

11

were made without prescriber approval. Plaintiffs repeatedly allege that "further investigation, including, *inter alia*, telephonic contact with [the plan member]; the obtaining of a Release from [the member] for her prescriber's medical records; and contact with the prescriber's office, has revealed that refill elimination was made without prescriber approval." *See e.g., id.* at ¶¶ 80, 96. Plaintiffs do not identify who at Caremark called the prescriber's office, who at the office approved the change, or whether that person was authorized to do so. Plaintiffs' entire scheme is premised on unauthorized prescription changes being incorporated into false claims. But plaintiffs have not alleged the changes or the false claims with enough detail to put Caremark on notice of the fraud. *See Garst*, 328 F.3d at 378 (essential to link allegations of deceit with claims); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Plaintiffs' previous complaints failed to provide this detail; the third amended complaint does not rectify the deficiency. *See Fowler II*, 2006 WL 2425331, *2.

The allegations supported by faxed authorization forms are similarly deficient. First, each allegation partially relies on the same boilerplate language described above. 3rd Am. Compl. at ¶¶ 115, 125, 142, 145. Second, only three of the four faxes provided indicate no prescription change should be made, and they only relate to one insurance plan. *Id.* at ¶¶ 114, 124, 141, Exs. 91, 95, 101. In other words, the alleged fraud, which plaintiffs contend afflicts every insurance plan, is supported by three examples pertaining to a single plan. Rule 9(b) does not require "a detailed description of each and every false claim when the fraud took place over many years;" however, plaintiffs must give Caremark adequate notice of the alleged fraud. *See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 334 (D. Conn. 2004) (citing *United States ex rel. Pogue v. Diabetic Treatment Ctrs.*, 238

F. Supp. 2d 258, 268 (D.C. Cir. 2004). Three faxes over a four year period that relate to one federal plan do not provide sufficient notice.[2]

Even assuming plaintiffs provided more examples, they have not alleged a false claim with the requisite particularity. Plaintiffs allege certain year-end savings reports are false because of Caremark's "pattern or practice" of misrepresenting that it obtained authorized prescription changes. 3rd Am. Compl. at ¶ 150. But plaintiffs do not specifically allege what the reported savings were, how those savings were inaccurate, whether Caremark would have met savings targets without the unauthorized changes, or the government's financial loss from the fraud. Instead, plaintiffs generally allege the false savings reports "were used by Caremark to avoid paying monetary obligations ('penalties') that it otherwise owed to those plans." *Id.* Plaintiffs fail to provide any specifics regarding the savings targets or the "monetary obligations." Their conclusory allegations fail to plead fraud with particularity. *See Veal v. First American Sav. Bank*, 914 F.2d 909, 913 (7th Cir. 1990) ("[c]onclusory allegations do not satisfy the requirements of Rule 9(b) and subject the pleader to dismissal").

### C. Turn-Around Times

Plaintiffs' proposed complaint alleges Caremark committed a scheme to defraud the government by misrepresenting the time in which it "turned around" prescription orders. Caremark

---

[2] The paucity of examples is highlighted by the extensive discovery plaintiffs conducted in this and related cases, including reviewing over 100,000 Caremark documents received from the United States Attorney's Office, *Fowler II*, 2006 WL 2425331, at *3, analyzing over 20,000 invoices, 3rd Am. Compl. at Exs. 18, 19, manually reviewing more than 13 million prescriptions, Mot. at ¶ 3, and contacting prescribers' offices to obtain plan members' medical records, *see e.g.*, 3rd Am. Compl. at ¶ 145. Plaintiffs' argument that they are unable to provide more detail because Caremark controls certain information lacks merit. *See Fowler I*, 2006 WL 1519567, at *4 (exceptions to Rule 9(b) relaxing pleadings standards do not apply).

was obligated under the contracts to meet certain turn-round time goals or it would be penalized. 3rd Am. Compl. at ¶ 151. Plaintiffs contend Caremark shipped orders between its own facilities, altered the dates prescription orders were received, and cancelled "old" orders to positively impact average turn-around times. *Id.* at ¶¶ 154, 155. According to plaintiffs, Caremark directed its employees to commit fraud "on a national basis" to ensure it met contractual guarantees and did not incur penalties. *Id.* at ¶ 153. Plaintiffs rely on approximately ten individual and summary examples in support of its allegations. *Id.* at ¶¶ 159-71, Exs. 120-136, 151, 174. Each example identifies the date the prescription order was received, the date it was sent to another facility, and the subsequent "false" received date. *See e.g., id.* at ¶ 168, Ex. 129.

After reviewing the exhibits, it is clear the third amended complaint does not plead the turn-around time scheme with particularity. The most glaring deficiency is plaintiffs' failure to identify any false invoices submitted to the government. Plaintiffs have failed to cure this defect from the prior complaint. *See Fowler II*, 2006 WL 2425331, at *7. Instead, plaintiffs attach "Guarantee Analysis" reports and allege they demonstrate a "pattern of fraud." 3rd Am. Compl. at ¶ 170. But only two reports are tied to substantive allegations, and they relate to only one insurance plan. *Id.* at ¶¶ 164, 170, Exs. 124, 134. Two examples relating to one plan cannot support allegations of company-wide fraud. The additional examples are referred to only summarily, making it impossible to determine what specifically is false about the reports and why. *Id.* at ¶¶ 170, 171, Exs. 135, 136, 151-60. Without particularized information regarding the false claims, *i.e.*, when they were made, by whom, and what false information they contain, plaintiffs cannot establish the necessary link between the fraudulent scheme and the false claims. *See Crews*, 460 F.3d at 857; *Gross*, 415 F.3d at 605.

14

The allegations also fail because plaintiffs provide no specifics regarding how Caremark's alleged fraud impacted average turn-around times. Fraudulent turn-around times are at the heart of the fraud scheme. Yet Caremark is left to speculate what the target averages were, which prescription orders negatively affected those averages, and how much the averages were inflated by Caremark's fraud, *i.e.*, the extent of the alleged fraud. In addition, the target averages differ depending on the type of action required by Caremark, but the complaint does not separately address the targets or the reported savings attributed to each action. 3rd Am. Compl. at Exs. 1, 2, 4-6, 9. Further, Caremark's argument is well taken that an extraordinary number of prescriptions exceeding the turn-around time averages would be necessary to materially alter those averages. Objections at 7 (pointing out that plaintiffs assert there are 13 million prescriptions at issue). But plaintiffs provide only a limited number of substantive examples relating to one insurance plan with no explanation of how the averages are affected. 3rd Am. Compl. at ¶¶164, 170, Exs. 124, 134. Plaintiffs simply do not carry their burden to link the fraudulent turn-around time scheme to specific false claims. *See Crews*, 460 F.3d at 857 (plaintiff's burden, especially when it is statistically possible that fraud had no effect on allegedly false claim).

### D. Reported "CCR" Savings, Generic Prilosec, and Drug Orders "Lost-In-Transit"

Plaintiffs allege three additional schemes in which Caremark defrauded the government: (1) Caremark misrepresented the amount of savings caused by its "CCR" cost-saving services, 3rd Am. Compl. at ¶¶ 172-91; (2) it refused to provide plan members with a generic version of Prilosec, *id.* at ¶ 192-98; and (3) it improperly billed the government for refills when members' prescription drugs were lost or stolen in the mail, *id.* at ¶ 199-210.

All three alleged schemes fail for the same reason: the conclusory allegations do not link the alleged frauds with false claims. Plaintiffs rely on phrases such as "each one of the monthly

15

invoices," *id.* at ¶ 181, "each and every one of those CCR Quarterly Reports," *id.* at ¶ 183, "each and every occasion," *id.* at ¶ 194, "[e]ach and every time," *id.* at 203, and "regular practices and procedures," *id.* at ¶ 207, to support its claims. Plaintiffs also rely on hypothetical allegations. *Id.* at ¶¶ 177, 201 (alleging Caremark "might" do something and stating "if Caremark sent an order for drug 'X' to Federal Plan Member 'ZZ'). Further, the examples provided are summary in nature or heavily excerpted. *See e.g.*, Ex. 148 (one document attached as a group exhibit listing only nine prescriptions without explanation). There are few, if any, substantive allegations identifying contractual provisions or state laws Caremark purportedly violated. There are even fewer identifying false invoices or bills submitted to the government. In fact, in 38 paragraphs alleging three separate schemes, there is not one concrete allegation describing the who, what, when, where, why, and how of the alleged frauds. *See General Elec. Capital*, 128 F.3d at 1078. Plaintiffs fail to tie particularized allegations of wrongdoing to specific false claims. *See Crews*, 460 F.3d at 858. This is exactly what caused the dismissal of plaintiffs' second amended complaint, and it warrants denial of plaintiffs' motion for leave to amend.

## CONCLUSION

The original complaint was filed in December 2003. Since then, plaintiffs have attempted three more times to plead a False Claims Act violation with particularity. While the amended complaints have grown in size (from 70 paragraphs to as large as 514 paragraphs with over 1000 pages of exhibits) and complexity, each have failed to plead a fraud scheme with sufficient detail to satisfy Rule 9(b). Over the past year, the court granted two of Caremark's motions to dismiss, issuing detailed opinions alerting plaintiffs to the deficiencies in their allegations. *See Fowler I*, 2006 WL 1519567, at *2-4; *Fowler II*, 2006 WL 2425331, at *2-3, 6-7. Despite the court's

instructions, plaintiffs' latest proposed complaint fails to cure the highlighted defects. Each new complaint requires Caremark and the court to invest considerable time and resources culling through the claims, drafting motions to dismiss, and responding to objections. At some point, the court must "throw up [its] hands" and dismiss the case. *See Garst*, 328 F.3d at 376. Now is that point. Plaintiffs have had ample opportunity, time, and direction by the court over the past three years to draft a valid cause of action. They have simply failed to do so. Future attempts to state a fraud claim adequately would be futile. Therefore, plaintiffs' motion for leave file a third amended complaint is denied, and the case is dismissed with prejudice. *See Garst*, 328 F.3d at 376; *General Elec. Capital*, 128 F.3d at 1085 (the court has discretion to dismiss a claim with prejudice after denying a plaintiffs' Rule 15(a) motion).

ENTER:

Suzanne B. Conlon
United States District Judge

November 30, 2006